**Chambers Estate**

*John J. Hughes*, for accountant.

*Edward V. Sciamanna*, for Commonwealth.

MARINO, P. J., June 2, 1960.—Anna B. Chambers, a widow, died January 23, 1959, testate. Her will was dated September 6, 1957. Prior to the time of her death, her adult unmarried daughter, Anna V. Chambers, had been an inmate at Selinsgrove State School for a period of slightly over 10 years. She died on May 4, 1958, without any estate. The Commonwealth of Pennsylvania has presented its claim in the amount of $8,310.46 for the maintenance of decedent's daughter at said school for the mentally retarded from February 7, 1948, to May 4, 1958, giving credit for certain payments made during said period by the father of the alleged incompetent prior to his death on August 16, 1957.

The facts are not in dispute. The amount of the claim was substantiated by proper evidence, and it is admittedly unpaid. Payment from the assets of this decedent's estate is refused by accountant, who presents four questions for adjudication.

1. Is the estate of the mother of inmate liable for cost of her daughter's maintenance in a State institution for the period prior to the death of her husband, the father of Anna V. Chambers, in August 1957, or only for that portion incurred after the death of decedent's husband?

2. Is the estate of the mother of this inmate liable for said costs for the entire period from February 7, 1848, to May 4, 1958, when the mother had no separate estate of her own until the death of her husband in August 1957?

3. Can the proceeds from the sale of real estate acquired by the parents as tenants by entireties in 1952, be used to satisfy the entire claim of the Commonwealth for support which dates back to 1948, prior to the time the real estate was acquired, or only for that portion of cost of maintenance accruing after the date of acquisition?

4. Is the mother's estate, consisting almost wholly of proceeds from the sale of real estate held as surviving tenant by the entireties, liable for the entire claim of the Commonwealth, or only for that part incurred after the death of her husband in August 1957?

The argument of the accountant is to the effect that, as far as the mother's liability is concerned, it is secondary. He maintains that her husband was the person primarily liable for the support of both mother and daughter up to the time of the husband's death in August 1957. The father, as head of the family, is responsible for maintenance and support of his wife at all times, and of his children at least during minority and beyond that if incapacitated. A fortiori, his wife could not be responsible for support of the daughter while the father lived.

This syllogistic argument can be demonstrated to be false because the major premise is false. True, the head of the family is the father, and as such, he is liable *at common law* for the support of wife and children. However, the instant liability is not one grounded in the common law, but that imposed by statute. The pertinent statutes make all the responsible parties equally liable, and do not fix any order of liability

among them. As to the Commonwealth, they are all *primarily* liable.

The Commonwealth's claim is based on the provisions of the Act of June 1, 1915, P. L. 661, sec. 3, as amended by the Act of May 10, 1921, P. L. 438, sec. 3, 71 PS §1783, the pertinent part of which reads:

"The husband, wife, father, mother, child, or children of any person who is an inmate of any asylum, hospital, home, or other institution, maintained in whole or in part by the Commonwealth of Pennsylvania, *and who is legally able so to do*, shall be liable to pay for the maintenance of any such person, . . ." (Italics supplied.)

As stated by Mr. Justice, now Chief Justice, Jones in Commonwealth v. Zommick, 362 Pa. 299, 301:

"The liability so imposed is direct and wholly independent of the inmate's common law liability which Section 1 of the Act declares and continues. The provision of Section 3 was for the protection of the Commonwealth (Harnish's Estate, 268 Pa. 128, 131, 110 A. 761) and imposed 'a new liability on others for the same debt' for which the inmate himself is liable, 'the legislative intention [being] to provide an additional source of payment in the nature of a suretyship': Bole's Estate, 316 Pa. 179, 182, 173 A. 664. The analogy to suretyship, of course, connotes that, as to the Commonwealth, the liability of the persons specified in Section 3 is primary. Its enforcement in no wise depends upon the Commonwealth's establishing antecedently that the recipient of the hospital service continues to be indigent. . . What may be the order of liability for such maintenance *inter partes,* i.e., as between the patient and the persons made liable by Section 3, is a question with which this case is not concerned."

In the above case, it is true that the father's *ability to pay* was admitted, that being in recognition of the

statutory provision that, before liability attaches, the relative must be one *"who is legally able so to do"*, that is, to pay for such maintenance. But the Commonwealth sought a judgment against a *living person*, the father of the incompetent, and it was incumbent upon it to prove that person's ability to pay.

In the instant case, estate counsel argues that the ability of the father to pay during his lifetime was never adjudicated by any court of competent jurisdiction, and states inferentially that this fact must therefore defeat the claim of the Commonwealth as to that portion applicable to maintenance of the incompetent from time of admission to date of death of the father, or from February 7, 1948, to August 16, 1957, a period of more than nine years.

The act is silent as to the procedure to effect collection of such claims against the estate of the person liable. But the courts have supplied this defect. In Harnish's Estate, supra, it was held that the proper forum for the enforcement of such liability against his estate is in the orphans' court administering the estate.

More recently, in Stoner's Estate, 358 Pa. 252, the various acts of assembly dealing with the subject of indigents were reviewed, and the court held that there was no inconsistency between the acts upon the question of the right of the Commonwealth to collect. It approved the ruling in Brubaker Estate, 346 Pa. 339, where it is stated:

"The Act of June 1, 1915, P. L. 661, imposes liability for the support of an indigent, insane child, in the interest of the Commonwealth, on, inter alia, its parent. The fact that there has been no effort to enforce this liability during the lifetime of the parent does not bar the enforcement of such liability by appropriate proceedings against the parent's estate: Harnish's Estate, 268 Pa. 128. The subsequent Act of

July 11, 1923, P. L. 998, known as The Mental Health Act, does not take away this right of the Commonwealth to present claims for expenses incurred in the maintenance of indigent, insane persons against their parents' estate *even though no effort to enforce such claims was made during the latter's lifetime. ... .*" (Italics supplied.)

Hence, the orphans' court undoubtedly has jurisdiction to adjudicate this case. In Harnish's Estate, supra, it was said, at page 132: "Here the statute imposed a liability upon the father for the support of his son, and, since the former's death, the proper forum for its enforcement is in the orphans' court; . . ."

As to the statute of limitations, it has been definitely decided that a claim of the Commonwealth is not barred by the statute even though it covers a period of time in excess of six years: Erny's Estate, 337 Pa. 542. The immunity of the sovereign cannot be denied in its exercise of a governmental function. That the maintenance and treatment of indigent, infirm and mentally defective persons is a strictly governmental function cannot be questioned: Commonwealth v. Liveright, 308 Pa. 35. Consequently, if any of the Commonwealth's claim is collectible it is totally collectible, even though a portion thereof dates back to a period more than six years before proper demand.

In a series of cases extending over many years the responsibility of near relatives for the support of indigent wards of the State in its institutions under the Act of June 1, 1915, P. L. 661, as amended, has been stated and clarified.

Regardless of relationship, the ability to pay is a condition precedent to the entry of judgment against the relatives of such indigents, where judgment is sought against a *living relative:* Commonwealth v. Groller, 41 D. & C. 366, 369; Commonwealth v. Stewart, 61 Montg. 257; Commonwealth v. Schmidt, 70

D. & C. 335. The ability to pay is of no consequence when the claim is pressed against the estate of the responsible relative or against the estate of the ward himself. The reason is at once obvious. It is clearly set forth in the unreported case of Belinda Joyce Estate, Orphans' Court of Philadelphia County, no. 1613 of 1949, where Sinkler, P. J., said:

"Were the decedent alive, ability to pay would be a condition to the recovery on the maintenance claim, because otherwise the government, by recovering for the maintenance of one person would pauperize the other and ultimately place upon the community or the government the burden of maintaining that other person. When the person sought to be charged has died, there is no longer the danger of his pauperization; it is merely a question of the liquidation of his estate.

"As an abstract proposition, it may be contended . . . that there is no 'cause of action' against a living person if he is not able to pay, and therefore, there is no 'cause of action' which can survive against his estate. The interpretation here followed is that the statute creates a cause of action for maintenance, but that, with respect to a living person, it attaches a condition that the cause of action cannot be enforced unless the person is able to pay.

"This condition is not applicable to a suit against a decedent's estate. Accordingly, the cause of action may be asserted against the decedent's estate without regard to its financial ability to pay."

The next problem presented by estate counsel is that concerning the time of ownership of real estate with respect to the time of rendition of the services by the State in its institutions.

It has been held that an estate acquired by a lunatic *after he became a public charge*, is liable for his previous maintenance: Arnold's Estate, 253 Pa. 517

(1916) ; Commonwealth ex rel. Posey v. Treat, 44 Berks 197 (1953) ; In re Emswiler, 63 York 58 (1950). The same rule would of course apply to the after-acquired property of any responsibile relative of such indigent.

Accountant advances the argument that there should be no distinction between property subjected to liability for maintenance of an indigent person receiving assistance or "welfare" and a mentally retarded indigent who receives care and treatment in a State institution. He points to The Support Law of June 24, 1937, P. L. 2045, sec. 4, as last amended by Act of September 26, 1951, P. L. 1455, sec. 2, 62 PS §1974(a), the pertinent part of which reads:

"The real and personal property of any person shall be liable for the expenses of—support, maintenance, assistance . . . *if such property was owned during the time such expenses were incurred. . . .*" (Italics supplied.) The proviso as to the ownership of property was first added by the amendment of June 9, 1939, P. L. 310.

He argues that the various acts of assembly dealing with assistance to indigents are concerned with the same class of persons and are therefore in pari materia. In this connection it may be noted that The Support Law of June 24, 1937, supra, and the Public Assistance Law of the same date, June 24, 1937, P. L. 2051, have been so held. In Bell Estate, 85 D. & C. 145, 150 (1953), the court said:

"From a careful reading of the two acts we can come to no other conclusion than they must be construed to be parts of one general system of administration of assistance by the Commonwealth. Section 62 of the Statutory Construction Act [of May 28, 1937, P. L. 1019], 46 PS §562, states that: 'Laws in pari materia shall be construed together, if possible, as one law'."

Undoubtedly, statutes are to be construed in harmony and in connection with the existing law, and as a part of a general and uniform system of jurisprudence. See 59 C. J. §616, p. 1038; Commonwealth v. Bacon, 8 S. & R. 135.

However, the subjects here treated are separate and distinct, and the legislature has recognized them as such. The insane and mentally retarded have been aided by the State since time immemorial. This has been a recognized governmental function since the earliest days of the Republic. In contrast, direct aid in the manner administered by our assistance laws has been a part of our law for a relatively short period of time. The Mental Health Act of June 12, 1951, P. L. 533, 50 PS §1071 et seq., is the culmination of more than a century of legislation on mental health and closely related subjects. This court cannot place such acts side by side with relatively recent acts, and consider them in pari materia.

The clause of section 4 of The Support Law of 1937, supra, which now engages our attention is that which provides that the real and personal property of the responsible individual shall be liable for support and maintenance *"if such property was owned during the time such expenses were incurred."* As previously stated, this clause was made a part of the act for the first time in the amendment of 1939. The courts fully recognized the intent of the legislature in adding the proviso. In Reiver's Estate, 343 Pa. 137, 139 (1941), the court said:

"Originally recovery could have been had even out of property acquired by the beneficiary subsequent to his receiving assistance . . . but by the Act of June 9, 1939, P. L. 310, amending section 4(*a*) of the Act of June 24, 1937, P. L. 2045, *it is limited to property owned by him during the time the assistance was ren-*

*dered* or his right to ownership of which existed or was acquired during such time." (Italics supplied.)

That action was one to recover for assistance given dependent children, not one for support of the mentally disturbed or incompetent. Accountant would have the court read this same limitation into The Mental Health Act of 1951, supra. This we cannot do. He argues, in effect, that the distinction is but an illusory one, with no real substance in fact, and that the law should not sanction what amounts to preferential treatment for one group of responsible relatives of an unfortunate indigent at the expense of another equally worthy class or division, and ultimately at the expense of the public. Why should the parents of a mentally retarded child be *fully responsible* for his care and maintenance while the same parents are only *partially responsible* for their own keep and that of their healthy children? Can it be that retribution is being visited upon the first class and not upon the second? Who is to accept responsibility for the birth of an abnormal child? Can the parents be blamed in any way? Would it not be much more logical to blame the parents for being unable properly to provide for their healthy children? In some instances this might be the result of pure laziness on the part of one or both of the parents, but who can blame a parent for the birth of a mentally retarded child?

These relevant questions, and many more, might be directed to the legislature, but not to the courts. We do not know what prompted the legislature to amend the Public Assistance Act of 1937 by inserting the "simultaneous ownership" clause in 1939, while The Mental Health Act of 1915 was completely revised in 1951 but no such ownership clause was added to make liable only property held during the time of rendition of the services for which payment is sought. We know simply

that both acts are specific in their provisions and must be given proper application.

We have seen that the liability of the mother's estate for the support of her indigent adult daughter in a mental institution is an absolute and primary liability as to the State: Commonwealth v. Zommick, supra. True, in the instant case there was no prior adjudication of liability by a coördinate court of competent jurisdiction, but for all practical purposes, the remedy against decedent's husband was exhausted. The record indicates that the husband paid during his lifetime the sum of $2,413.72, leaving a balance due of $7,099.88 at his death. This shows that he was making payments in accordance with his "ability to pay". On his death, no administration was raised on his estate as there remained only the real property which was held in an estate by the entireties. Court action at that time would have been vain and useless. Even during the lifetime of the husband and wife an action to recover the proceeds of sale of the real estate so held under provisions of section 3 of the Act of 1915, supra, as amended by the Act of May 10, 1921, P. L. 438, would have failed, as the entireties property could be executed on only if either spouse had been maintained in an institution. See Commonwealth v. Silvestro, 88 D. & C. 232 (1954).

As to the present proceeds of sale of real estate which had been held as tenants by the entireties, the problem here is purely academic as decedent was the survivor in such tenancy, and exclusive title thereto became vested in her by operation of law at her husband's death. The source of her estate is of no concern at the moment. It was her own exclusive property at the time of her death, and that is all that is required.

The conclusion is that neither the statutes nor decisional law support the accountant's contention that only part of the maintenance claim of the Common-

wealth is a valid one. His application must be addressed to the legislature.

Accordingly we are obliged to hold: (1) That the estate of the mother of the inmate is liable for her daughter's keep both prior to and after the death of the inmate's father; (2) that the said estate is so liable even though no separate property was owned by her during the time of the rendition of the services; (3) that the said estate is so liable even from proceeds of sale of after-acquired property; and (4) that the said estate is liable regardless of the source of the estate assets.

Therefore the claim of the Commonwealth of Pennsylvania in the sum of $8,310.46 for costs of care and maintenance of decedent's adult daughter, Anna V. Chambers, in Selinsgrove State School is hereby allowed in full and accountant is directed to pay the same out of the assets of the estate, and credit is hereby allowed therefor.